IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EDGAR ALFONSO PEREZ-MONROY,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 2:10-CR-139<br><br>Judge Dee Benson |

This case is before the court on defendant Edgar Alfonso Perez-Monroy's Motion to Suppress. (Dkt. No. 9.) On May 12, 2010, the court conducted an evidentiary hearing on the motion. Defendant Perez-Monroy was present with his counsel Randy S. Ludlow. The government was represented by Scott B. Romney. Following the hearing, the court ordered a transcript as well as briefing from the parties. Having considered the parties' briefs and the evidence presented at the hearing on the motion to suppress, the court enters the following memorandum decision and order.

1

**FINDINGS OF FACT**

The court finds the relevant facts as follows.  On January 27, 2009, the defendant was arrested at his workplace, the Rice King Café, in Richfield, Utah.  The charges were theft of a firearm, possession of a firearm by a restricted person, and aggravated assault.  Detectives Kerry Ekker and Jason Haywood conducted the arrest.  (Tr. at 9-10.)[1]  Detective Ekker then transported the defendant to the nearby Sevier County Sheriff's Office.  (Tr. at 9-10.)

The arresting officers were unable to communicate with the defendant because he did not speak English.  Accordingly, Detective Haywood contacted Deputy Cody Barton, a Sevier County police officer who speaks Spanish, and asked him to meet them at the sheriff's office to translate for them.  (Tr. at 12.)  Upon arrival at the sheriff's office, Detective Ekker led the defendant to a small interview room.  (Tr. at 13.)  Detective Ekker and Detective Haywood were in the interview room with the defendant, along with Deputy Barton who was serving as a translator.  (Tr. at 13.)  Deputy Barton's translation of the conversation into Spanish was "good" and accurate in all material respects, and the defendant understood Deputy Barton.  (Tr. at 68, 71.)

Before any questioning took place, Detective Ekker instructed Deputy Barton to read the defendant his Miranda rights, and he provided Deputy Barton with a card that had the Miranda rights in English and Spanish.  (Tr. at 16-17.)  Deputy Barton read the Miranda rights to the defendant in Spanish.  (Tr. at 17, 36-37.)  Deputy Barton then asked, "do you understand each of these rights that I have just explained to you?" and the defendant said "yes."  (Pl.'s Ex. 2,

---

[1]Reference to the transcript of the evidentiary hearing conducted on March 12, 2010, will be cited as "Tr. at __."

Transcript of Interview.)  Deputy Barton then asked, "do you want to give up your right to remain silent?" and the defendant said, "no."  (Tr. at 38-39.)

Deputy Barton informed Detective Ekker that the defendant did not want to talk about the case and Detective Ekker acknowledged the defendant's response, saying "okay."  Detective Ekker then instructed Deputy Barton to advise the defendant, for the first time, of the charges against him and why he had been arrested.  (Tr. at 19; Pl.'s Ex. 2 at 3.)  Detective Ekker had not previously informed the defendant of the charges against him because he could not communicate with the defendant due to the language barrier.

As instructed, Deputy Barton advised the defendant of the charges against him – theft of a firearm, possession of a firearm by a restricted person, and aggravated assault – and asked the defendant if he understood the charges as they had been explained to him.  (Pl.'s Ex. 2 at 4; Tr. at 53.)  The defendant indicated that he understood and asked, "can I answer?"  (Pl.'s Ex. 2 at 4.)  Rather than allowing the defendant to continue speaking and potentially incriminate himself, "for [the defendant's] benefit," Deputy Barton stopped the defendant and reminded him of his right to remain silent.  (Tr. at 53.)  Deputy Barton asked, "well, do you want to give up the right to remain silent?  Do you want to give up the right to speak with [an] attorney and to have one present . . . ?"  (Pl.'s Ex. 2 at 4.)  The defendant responded, "I don't know, I've never had a problem like this . . . ."  (Pl.'s Ex. 2 at 4.)

Exercising an abundance of caution, Deputy Barton once again explained the defendant's rights.  This time, Deputy Barton expressly stated:

> you have the right to have an attorney present.  If you don't want to talk to us without an attorney, you don't have to do it . . . without an attorney.  That's your

3

>right, is what I was telling you.  If you want to talk to us, you can, if you want a lawyer you can say so and . . . that's it.

(Pl.'s Ex. 2 at 5.)  Following this explanation, Deputy Barton asked the defendant if he wanted to answer the officers' questions about the weapon and the charges.  The defendant said, "yes." (Pl.'s Ex. 2 at 5; Tr. at 41.)  Despite the defendant's affirmative response, Deputy Barton asked again, "Yes you want to answer those?" and the defendant again said "yeah."  (Pl.'s Ex. 2 at 5.) Deputy Barton then continued, "do you want an attorney present, or no?"  The defendant said, "yes."  (Pl.'s Ex. 2 at 5.)  At that point, Deputy Barton informed Detective Ekker, "he says he'll answer the questions, but he wants a lawyer."  (Pl.'s Ex. 2 at 5.)  Detective Ekker responded, "okay, that's fine."  (Pl.'s Ex. 2 at 5.)  Detective Ekker then ceased all questioning, immediately ended the interview, and turned off the audio recording of the proceedings.  (Tr. at 21.)

As he was shutting down the interview, Detective Ekker said to Detective Haywood, "while we're here," can you get a picture of the defendant and take it to the alleged victim in order to get a positive identification.  (Pl.'s Ex. 2 at 5.)  The alleged victim (who claimed to have been shot at by the defendant) was at the Sevier County jail, which is located in the same building where the interview was taking place.  (Tr. at 21.)  Detective Haywood complied, taking a picture of the defendant on his cell phone and then walking the photograph over to the jail to show the alleged victim.  (Tr. at 22.)

Shortly thereafter, Detective Ekker also stepped out of the room for a moment on a phone call.  (Tr. at 44.)  Deputy Barton and the defendant were "just kind of sitting there staring at each other," so Deputy Barton and the defendant engaged briefly in "small talk."  (Tr. at 44.)  The tone of the conversation was calm and was in no way intended to elicit information about the

charges. (Tr. at 44.) As part of the "small talk," Deputy Barton, who had previously been on a religious mission in Mexico, "asked [the defendant] what part of Mexico he was from, and told [the defendant] that [he] had been down there." (Tr. at 44.) Deputy Barton made these comments "just kind of to fill the void." (Tr. at 44.) The record reflects no direct response by the defendant to this question.

The defendant then asked Deputy Barton what was going to happen to him. (Tr. at 45.) Deputy Barton mentioned the charges again, and told the defendant that he would be placed in jail on those charges. (Tr. at 45.) At that point, the defendant spontaneously told Deputy Barton that "he only got the gun for the coyotes." (Tr. at 45.) Deputy Barton immediately stopped the defendant and explained that the defendant should not say anything about the case because he had already said that he wanted a lawyer. (Tr. at 45.)

Detective Ekker, who had been in the hallway, overheard the defendant say the word "coyotes," and asked Deputy Barton if the defendant had changed his mind and wanted to talk about the case. (Tr. at 46.) Detective Ekker instructed Deputy Barton to ask the defendant if he now wanted to answer Detective Ekker's questions. Deputy Barton relayed the question, and in doing so, reminded the defendant, yet again, that he did not have to answer any questions about the case without a lawyer present. (Tr. at 46.)

The defendant told Deputy Barton, "yes, I want to answer the questions." (Tr. at 46.) Deputy Barton immediately followed up asking the defendant, again, "if he really wanted to tell his side of the story." (Tr. at 58) Deputy Barton "reminded [the defendant] that he had attorney'd up, and asked him if he wanted an attorney to be present while he told his side of the

story." (Tr. at 58.) Deputy Barton told the defendant "that he could have a lawyer with him and that he didn't have to do it without a lawyer." (Tr. at 48.) In response, the defendant said, "yes, I want to talk," and he seemed "excited" and "anxious to tell his side of the story and defend himself." (Tr. at 48.)

From that point forward, the defendant did most of the talking, explaining his version of the events. (Tr. at 48.) The defendant did not hesitate nor was he equivocal about telling his story, and he never gave any indication that he did not want to talk to Detective Ekker about the case. (Tr. at 48.) The conversation that followed lasted approximately 12-15 minutes. During that time, the defendant made statements to the officers about the crimes for which he had been charged.

The defendant now asks the court to suppress the statements he made during the interview on January 27, 2009. Defendant asserts that the statements were obtained as a result of police questioning in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Dkt. No. 9, Def.'s Mot. to Suppress.) More specifically, the defendant claims that his rights were violated when Deputy Barton continued to interrogate him after he had clearly invoked his right to counsel. The government, on the other hand, contends that the defendant subsequently re-initiated the interview and validly waived his right to counsel.

## DISCUSSION

Prior to being subjected to custodial interrogation, it is well-established that a suspect must be advised that he has the right to remain silent and that he has the right to an attorney, and if the defendant invokes those rights, the interrogation must cease. Miranda v. Arizona, 384 U.S.

436, 479 (1966).  This was reiterated, but with a significant qualification in Edwards v. Arizona, 451 U.S. 477 (1981).  In Edwards, the Court provided that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by authorities until counsel has been made available to him, *unless the accused himself initiates further communication*, exchanges, or conversation with the police."  Id. at 484-85 (emphasis added).

In subsequent cases, the Supreme Court has explained that the Edwards rule "embodies two distinct inquiries."  See Smith v. Illinois, 469 U.S. 91, 95 (1984).  "First, courts must determine whether the accused actually invoked his right to counsel.  Second, if the accused invoked his right to counsel, the courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked."  Id. (citations omitted); see Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983); see also Edwards, 451 U.S. at 486 n.9 (providing that the burden is on the prosecution to demonstrate that, under the totality of the circumstances, the suspect, not the police, was the one who "reopened the dialogue with the authorities," and the suspect knowingly and intelligently waived his rights to silence and counsel).

In this case, the parties do not appear to dispute that the defendant invoked his right to counsel.  (Govt.'s Mem. In Opp'n at 3.)  Accordingly, based on the foregoing authorities, the court must determine whether, under the totality of the circumstances, the government has satisfied its burden of proving (a) the defendant himself initiated further discussions with the officers, and (b) that the defendant knowingly, intelligently and voluntarily waived the right to

remain silent and to counsel.

### (A) Initiation of Further Communication

As set forth above, because the defendant invoked his right to counsel, he could not be subjected to further interrogation unless the defendant initiated further "communication, exchanges, or conversations" with the authorities. <u>Edwards,</u> 451 U.S. at 485. In this case, the government contends that the defendant initiated a communication with the officers within the meaning of <u>Edwards</u> when, after he invoked his right to counsel and the initial interview had been terminated, the defendant asked Deputy Barton what was going to happen to him. (Tr. at 45.) The defendant asserts, however, that Deputy Barton continued to interrogate him after he invoked his right to counsel, and that it was during the course of this continued interrogation that the defendant asked, "what is going to happen to me?" (Def.'s Mem. In Supp. at 12.) In other words, the defendant claims that although the formal interview may have terminated upon his request for counsel, Deputy Barton continued to engage the defendant in "small talk" that was the equivalent of "interrogation" in violation of his previously invoked right to counsel. (Mem. In Supp. at 9-12.)[2]  Because under <u>Edwards</u> the defendant's "initiation of further

---

[2]The defendant also claims that the officers violated his <u>Miranda</u> rights by explaining the charges against him immediately after he invoked his right to remain silent and then asking him if he understood those charges. (Mem. In Supp. at 10.)  The court finds there was nothing improper about the manner in which the charges were presented, especially in light of the fact that Detective Ekker had previously been unable to do so because of the language barrier. Explaining the charges to the defendant falls squarely within the category of police conduct that is "normally attendant to arrest and custody." <u>Innis</u>, 446 U.S. at 299; <u>see also</u> <u>Bradshaw</u>, 462 U.S. at 1045 ("Inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in <u>Edwards</u>."). Moreover, the court finds there was nothing inappropriate about presenting the charges in the form of a question and then asking the defendant if he understood, especially given these circumstances where the officer was

communication" must come prior to any further interrogation by the police, the court necessarily begins by considering whether Deputy Barton's "small talk" with the defendant amounted to "interrogation" in violation of the defendant's request for counsel. See United States v. Gomez, 927 F.2d 1530, 1538-39 (11th Cir. 1991) ("The 'initiation' must come prior to the further interrogation; initiation only becomes an issue if the agents follow Edwards and cease interrogation upon a request for counsel.")

1. **Further Interrogation**

The term "interrogation" under Miranda refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The test for whether an interrogation has occurred is an objective one." United States v. Rambo, 365 F.3d 906, 909 (10th Cir. 2004) (citing United States v. Gay, 774 F.2d 368, 379 n.22 (10th Cir. 1985)). "The focus is on the perception of a reasonable person in the suspect's position rather than the intent of the investigating officer." Rambo, 365 F.3d at 909 (citing Innis, 446 U.S. at 301).

Applying this standard, the court finds that Deputy Barton's brief conversation with the defendant, after Detective Ekker terminated the interview, did not amount to police-initiated interrogation. As the facts demonstrate, after the defendant requested an attorney, the officers immediately ended any attempt to interview the defendant. This is evidenced by the fact that the

---

translating the charges into Spanish. Under these conditions, stating the charges in the form of a question cannot reasonably be understood as an attempt to elicit an incriminating response, but rather to ensure the defendant could understand the translation.

audio recording was shut off and Detective Ekker and Detective Haywood – the investigating officers on the case – both left the interview room. Only the defendant and Deputy Barton, who was there serving only as translator and not an interrogator, remained in the room, "just kind of sitting there staring at each other." (Tr. at 44.) Then, in an attempt to "fill the void," Deputy Barton engaged the defendant in "small talk." Tr. at 44. The conversation was casual in nature and brief in time.

      Considering the relevant context, the court finds that Deputy Barton's conversing briefly with the defendant while the investigating officers were pursuing other tasks was akin to conversation that is "normally attendant to arrest and custody." See Innis, 446 U.S. at 299. The sole purpose of the brief conversation was to fill a void while the investigating officers were attending to other tasks. In an attempt to ease the awkwardness, Deputy Barton asked what is commonly considered a routine conversational question–where are you from? Based on the manner in which the charges were presented there was no reason for Deputy Barton to believe that asking the defendant where he was from was anything other than benign, and he had no reason to believe it would elicit anything relevant to the investigation nor did it.

      Although one of the criminal charges included "restricted person in possession of a firearm," there are many different categories of restricted persons, and the charges as presented to both Deputy Barton and the defendant were not specific. In addition, asking the defendant where he was "from" was a general question, and was not specifically directed at any legal issue such as alienage or citizenship. Moreover, the record reflects no response from the defendant to the question. (Tr. at 22-23.) The only statement by the defendant was not responsive to Deputy

10

Barton's general question, but rather focused on an entirely different subject: "what is going to happen to me?"  Finally, while the court is mindful that Deputy Barton's intent is not determinative here, the Supreme Court has indicated that it "may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."  Rhode Island v. Innis, 446 U.S. at 302 n.7.  In this regard, the court finds it significant that Deputy Barton testified at the suppression hearing that the brief conversation was simply to "fill the void" and was in no way intended to elicit information about the crime or the gun.  (Tr. at 44.)  Based on the foregoing, the court is satisfied that the "small talk" between Deputy Barton and the defendant did not constitute the type of "custodial interrogation" that would violate the rule in Edwards v. Arizona.

2. **Initiation of Communication**

Having determined that Deputy Barton did not "interrogate" the defendant after he invoked his right to counsel, the court turns its attention to whether the defendant initiated further communication about the investigation with the officers.  To determine whether the defendant initiated further communications with the officers, the court must evaluate whether he "evinced a willingness and a desire for a generalized discussion about the investigation," keeping in mind that not every statement by an accused will "initiate" a conversation with police as contemplated by Edwards.  See Bradshaw, 462 U.S. at 1045-46 (observing for example, that inquiries or statements that are "routine incidents of the custodial relationship" – such as a request for water or use of a telephone – do not "initiate" conversation about the investigation).

In Oregon v. Bradshaw, 462 U.S. 1039 (1983), the Supreme Court held that the

defendant's statement, "Well, what is going to happen to me now?" initiated further conversation with a police officer, and the Court found that the defendant's subsequent admissions did not violate Miranda because he thereafter knowingly and intelligently waived his rights. According to the Supreme Court, asking officers to explain "what is going to happen" evinces a "willingness and a desire for a generalized discussion about the investigation" that can reasonably be interpreted as initiating communication with the police. Id. at 1045-46.

Relying on Bradshaw, the United States Court of Appeals for the Tenth Circuit in United States v. Obregon, 748 F.2d 1371 (10th Cir. 1984), determined that a defendant's question – inquiring of an agent what would happen if he told her what she wanted to know – likewise initiated further conversation. And, after determining that the defendant voluntarily waived his previously invoked right to counsel, the Tenth Circuit also concluded that the defendant's subsequent statements need not be suppressed. Id. at 1381; see also United States v. Velasquez, 885 F.2d 1076, 1085 (3rd Cir. 1989) (holding that defendant's comment "What is going to happen?" reflected his willingness to engage in a generalized discussion about the investigation).

In this case, the defendant posed a remarkably similar question, asking Deputy Barton what was going to happen to him. (Tr. at 45.) This court likewise concludes that the defendant's question "evinced a willingness and a desire for a generalized discussion about the investigation," and therefore initiated further conversation with the officers as contemplated by Edwards and Bradshaw.[3]

---

[3] Having concluded that the defendant, not the police, initiated further communication about the case, the Mosley four-part test, advocated by defendant, is inapplicable. United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006) (providing that Mosley does not apply "if the suspect, and not the police, reinitiates contact and agrees to questioning").

**(B) Knowing, Intelligent and Voluntary Waiver**

Finding that the defendant initiated the subsequent conversation does not end the inquiry. As set forth above, the court must next determine whether, under the totality of the circumstances, the defendant made a knowing and intelligent waiver of his right to have counsel present. Oregon, 462 U.S. at 1046 (citing Edwards, 451 U.S. at 486 n.9); see also United States v. Roman-Zarate, 115 F.3d 778, 782 (10th Cir. 1997) (providing that the government bears the burden of proving by a preponderance of the evidence that the waiver was voluntary). The Supreme Court has articulated the following requirements for a valid waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986).

Applying these principles, the court has no difficulty concluding that the government has satisfied its burden of proving that the defendant's waiver in this case was knowingly, intelligently, and voluntarily given. At the outset, Deputy Barton read the defendant his Miranda rights from a printed card, translated into Spanish – the defendant's native language – and went through each right in detail. (Tr. at 36-37.) There is no evidence that any language barrier or translation issues prevented the defendant from understanding the rights as they had been explained. Deputy Barton testified that he had no problem communicating with the defendant, the defendant similarly testified that he understood Deputy Barton, and the defendant's expert testified that Deputy Barton spoke "good" Spanish. (Tr. at 34, 68, 71.) Additionally, the

defendant testified that he understood that he had the right to remain silent and the right to counsel, and the record reflects that the defendant was reminded of and advised of these rights multiple times during the interview in question. (Tr. at 52.)

Moreover, the officers did not intimidate, trick, coerce or threaten the defendant in any way, and the defendant expressly testified at the evidentiary hearing that he was not tricked, coerced, intimidated or threatened by the officers. (Tr. at 74.) The record confirms that the officers were polite and professional and is completely void of any evidence to suggest that the atmosphere was oppressive or coercive. The record also indicates that the sole reason for the repeated recitation of rights was for the defendant's benefit – to make sure he understood – and the officers made every effort to ensure that the defendant did not unintentionally or unknowingly waive his rights.

## **CONCLUSION**

The purpose of Edwards is "to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990). In this case, the harm which Edwards sought to prevent is completely lacking. There is absolutely no evidence of badgering or coercion, and the sole reason for the repeated recitation of rights was for the defendant's benefit – to make sure he understood. The officers were especially vigilant about ensuring that the defendant both understood and then did not unknowingly waive his rights. As the record demonstrates, on several occasions when the defendant would come close to saying something that might cause him to unknowingly jeopardize or waive his rights, the officers would stop him and remind him of his right to remain silent and his right to counsel.

In this context, the Tenth Circuit has explained: "Simply stated, a defendant – even if he has asserted the right to counsel – may choose to reinitiate contact with the police so long as the government does not coerce him into doing so." United States v. Alexander, 447 F.3d at 1290, 1294 (10th Cir. 2006). That is precisely what occurred here. The defendant, having initially chosen to assert his right to counsel, changed his mind.

Based on the foregoing, the court concludes that although the defendant initially invoked his right to counsel, his subsequent initiation of conversation related to the investigation and his knowing and voluntary waiver of his rights permitted the officers to interrogate him regarding the charges. Accordingly, defendant's motion to suppress is DENIED.

DATED this 17th day of August, 2010.

_____
Dee Benson
United States District Judge